IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

    Plaintiff

    v.

ENRIQUE ARISMENDI VELEZ

    Defendant

CRIMINAL NO.  06-116 (CCC)

**REPORT AND RECOMMENDATION**

    Defendant stands charged with violating 8 U.S.C. § § 1324 (a)(1)(A)(ii), (a) (1) (A) (iii) and (a) (1) (A) (V) (II), to wit, harboring and attempting to move illegal aliens within the United States. He has moved to suppress evidence obtained by the Government during the search of his residence, which he characterizes as being illegal (see Docket No. 46).

    The Court held a suppression hearing on June 28, 2006 and concluded the same on July 5, 2006.[1] In a nutshell, defendant alleges that the Government conducted a warrantless search of his residence. The Government, in turn, concedes this point, however, contends that exigent circumstances existed, thus obviating the need for a search warrant.

    Upon careful review and consideration of the evidence presented by the Government and defendant[2], the Court concludes that exigent circumstances for the warrantless search of the residence indeed existed.[3] Thus, the motion to suppress must be denied.

    The salient facts are taken from the testimony of ICE Special Agent Luis Fombellida, which the Court finds to be credible in its entirety, as well as consistent with the documentary evidence.

---

[1] This matter was initially referred to Chief Magistrate-Judge Justo Arenas. However, on the scheduled date of the hearing, he became ill, and thus, was substituted by the undersigned.

[2] The Government presented the testimony of ICE Senior Special Agent Luis Fombellida and various exhibits. Defendant presented various additional exhibits, most of which were stipulated by the parties.

[3] Because exigent circumstances existed, the Court need not concern itself with making a determination as to whether the Government properly executed a "knock and talk" procedure prior to the entry. Cf. United States v. Boulanger, 444 F. 3d 76, 81-83 (1st Cir. 2006) (no-knock entry justified where announcing presence would have been dangerous).

**CRIMINAL NO. 06-116 (CCC)**                           2

These are as follows:

1. On Tuesday, March 14, 2006 at approximately 9:00 a.m., Fombellida was contacted by Agent José Bracero of the PRPD. Bracero informed Fombellida that a reliable CI gave him information about a house in Yauco where a large number of illegal aliens were being stashed. Fombellida, at the time, had information that over the previous weekend a yawl with illegal aliens had landed in Cabo Rojo. Some aliens were apprehended, but the majority escaped.

2. Agent Fombellida proceeded to Yauco to corroborate the CI's tip. Because the house at issue was located in the middle of the mountains, Fombellida needed to take a rural road, then several nameless small roads to get there.

3. Fombellida proceeded to identify the defendant's home, and defendant as its owner. He also was able to obtain the criminal record of defendant, who was previously convicted in federal court in a narcotics case, and served time in prison.[4]

4. Fombellida set surveillance of the defendant's residence at approximately 10:00-10:30 a.m.. By 11:00-11:30 a.m. he was able to corroborate a further fact provided by the CI, specifically, that a large number of aliens was to be transported in a white Ford Econoline, whose license number was provided. At approximately 11:30 a.m. the white van arrived at the defendant's house. The CI had informed that the white van had left with the illegal aliens, but that others were still in the house.

5. When the white van arrived at the house, defendant Arismendi exited the vehicle. Co-defendant Ernie Vargas-Rosa also was in the van.

6. Near the time the white van arrived at the defendant's residence a Dodge intrepid also arrived.

7. At approximately 2:30 p.m. defendant Arismendi came out of the house and placed

---

[4] The ECF records of the Court verify this. Defendant pled guilty in Criminal Case No. 97-284 (JAF) to one count of conspiracy to possess with intent to distribute at lease 1,000 but less than 3,000 kilograms of marijuana. He was sentenced on March 14, 2000 to 57 months imprisonment and 4 years of supervised release. (Docket No. 692). The Court notes that in said case, defendant's name is spelled *Arizmendi*.

**CRIMINAL NO. 06-116 (CCC)**               3

a large cardboard box in the trunk of the Dodge Intrepid. Three persons then entered the car, Mr. Wilfredo Padilla (not a defendant in this case) and co-defendants Jeffrey Ducot and Daniel Lebrón. The Dodge then left the residence.

8. Fombellida and several agents proceeded to follow the Intrepid while other agents remained surveying the house. At this time the CI had provided further information that defendant Arismendi had told Padilla to get rid of the box.

9. While the Intrepid was en route to Mayagüez on highway No. 2, the PRPD officers stopped it due to a speeding violation. The driver, Padilla, consented to the opening of the trunk and search of its contents.

10. Inside the box, the officers found dirty clothes, full of sand and having bad odors.[5] Fombellida stated that this soiled clothing is typical of illegal aliens, who have been in the high seas, then hide in beach areas until picked up.

11. The detainees were transported to the Hormigueros police station. Thereat, Fombellida was informed that Padilla wanted to cooperate.

12. Fombellida then took Padilla to the Yauco station. After verbally informing him of his *Miranda* rights, Padilla stated that ten illegal aliens, whom he had seen, remained in the home. He also said that in the morning 28 other such aliens had been taken in a van to San Juan.

13. Padilla further told Fombellida that a "Mr. Solis" would pick up the remaining illegal aliens at around 5:30 - 6:30 p.m. that same day.

14. Given the fact that Padilla had corroborated the information provided by the CI, Fombellida returned to the defendant's house to continue the surveillance. At all times thus far during the surveillance, that day, all the agents were positioned outside of the curtilage of defendant's home so they would not be detected.

---

[5] Defendant conceded he has no standing to contest the search of the trunk and box. Notwithstanding, a motion to said effect, filed by a co-defendant, was denied by Magistrate-Judge Arenas in his R & R (Docket No. 57).

**CRIMINAL NO. 06-116 (CCC)**                4

15. At around 5:30 p.m. codefendant Manuel Vélez arrived at the house with defendant José Pérez in a red pick-up truck. They brought a lot of food. The CI had informed that said food was for the aliens.

16. Fombellida and the other agents continued to wait for Mr. Solis. The CI informed that Arismendi and Solis had exchanged plenty of phone calls in negotiating the fees for the aliens.

17. At approximately 7:00 p.m. (it was twilight outside) co-defendants Pérez and Vélez got into the red Explorer. Fombellida and other agents followed the vehicle to Cabo Rojo and arrested Pérez and Vélez.

18. Fombellida quickly returned at approximately 7:30 p.m. to defendant's house because the CI had again provided information that Solis was on his way. The surveillance continued. Fombellida, at the time, had approximately 11-12 federal, state and municipal officers assisting him.

19. By 8:00 p.m. Fombellida communicated with the CI, who again informed that Solis was on his way to Yauco. Yet nothing happened.

20. Fombellida's supervisor became concerned that the later it got, the more dangerous it became. Thus, he instructed Fombellida that if Solis did not arrive by 9:00 p.m., the agents should proceed to conduct a "knock and talk" procedure.

21. Fombellida explained that the purpose of the "knock and talk" was for the officers to advise they had reason to believe that the illegal aliens were inside, and to ask for consent to enter and search the dwelling.

22. Fombellida further explained that his original intention was to arrest the aliens outside the residence when Solis arrived to pick them up.

23. At 9:00 p.m., a marked unit driven by officer Efraín Burgos, with Sargent Rivera and agent Bracero inside, parked in front of the gate of the residence. Because the house was some distance away from the gate, they walked towards it to perform the "knock and talk" procedure.

**CRIMINAL NO. 06-116 (CCC)**                5

24. The defendant's house had Miami-type windows with light curtains. Because there was light inside of the structure, the officers could see silhouettes of persons and objects inside.

25. As the officers approached the house, pandemonium erupted inside. The aliens saw them and started scrambling and running.

26. The officers thus became concerned that the aliens would abscond if they left the residence, because the same was surrounded by open fields. More so, the CI had warned the officers that the residence had a back door.

27. Officer Bracero, thus, ran towards the back of the house to block the back door.

28, At this same time, the officers noticed an individual hiding behind the wall next to the front door. They became concerned that he be armed.

29. A decision to go in was made and Sergeant Rivera kicked down the front door.

30. The decision to enter was based on the following factors: (i) a person was hiding behind the door, thus possibly posed a threat; (ii) the illegal aliens were scrambling around; (iii) the aliens likely had been in a yawl for over one day, plus had been hiding in the woods for another day, possibly without food and water; (iv) the aliens had secured what they sought would be "freedom"; if they were now caught, they, could react violently; (v) the officers became concerned for their safety and had reason to believe defendant had weapons due to his prior record; (vi) the defendant's children were inside the house; and (vii) the aliens had previously absconded from the Border Patrol and Coast Guard. Therefore, emergency circumstances existed to enter without a warrant, and without "knocking and talking".

31. Inside the house, ten (10) aliens were apprehended. So was defendant.

32. Nothing from the residence was seized, except a piece of cardboard with Dominican Republic telephones scribbled, and some Dominican currency which was found on top of the cardboard.

During cross-examination, the following additional facts were adduced:

**CRIMINAL NO. 06-116 (CCC)**                6

33. A cyclone fence, approximately 4 ½ feet in height, surrounds the residence.

34. There is a drop behind the defendant's house, which varies from approximately 2 feet to 8 feet.

35. Even though the affidavit in support of the complaint and report of investigation, both prepared by Fombellida, state "knock and announce", this was an error on his behalf, and instead should read "knock and talk".

36. Fombellida had probable cause to arrest Arismendi, between 4:00-4:30 p.m., upon corroborating the CI's information with Padilla's admissions. At this time, however, Fombellida did not have sufficient time to procure and obtain a search warrant of the residence. By then Solis was purportedly on his way to Yauco, as informed by the CI. It was, thus, impossible time-wise to draft an affidavit, and get it approved by the duty AUSA, to then be taken to a Magistrate-Judge. By this time, the aliens could have well left the house.

## ANALYSIS

Police officers are justified in entering a house without a warrant if the exigencies of the situation render the needs of law enforcement extremely compelling. Brigham City, Utah v. Stuart, ___ U.S. ___, 126 S. Ct. 1943, 1947 (2006) (citing Mincey v. Arizona, 437 U.S. 385, 393-394 (1978)). Whether compelling exigencies are indeed present must be determined on a case by case basis, based on an objective analysis of the particular facts. See id. at 1948; see also United States v. Whibey, 75 F. 3d 761, 766 (1st Cir. 1996) ("exigency determinations are generally fact-intensive and thus must be made on a case by case basis . . . Exigency must be assessed in light of the totality of the circumstances"). The actions of Government officials, thus, must be reviewed "from the perspective of reasonable agents on the scene who are legitimately concerned with not only doing their job but with their own safety". United States v. Boulanger, 444 F. 3d 76, 85 (1st Cir. 2006).

Exigent circumstances have been recognized in instances where there is a danger to the safety of the public or the police, or a possibility that a suspect may flee undetected. Whibey, 75 F. 3d at 766. These factors, however, must be assessed in light of the totality of circumstances. Id..

A careful analysis of the facts of this case under a totality of circumstance analysis clearly

**CRIMINAL NO. 06-116 (CCC)**                              7

leads to the conclusion that Special Agent Fombellida and other officers were faced with exigent circumstances requiring them to make a warrantless search of defendant's house. The Court agrees with Agent Fombellida in that, although there was reasonable suspicion to believe that the illegal aliens were in defendant's house in the morning hours, probable cause to obtain a search warrant did not exist until Padilla was arrested and gave a corroborating statement at approximately 4:30 p.m.. At this time, Fombellida had, based on Padilla's information, only one hour left until Solis purportedly would arrive in Yauco to pick up the illegal aliens. This was clearly insufficient time in which to obtain a warrant. See, e.g., Whibey, 75 F 3d at 766 (noting that it takes substantially more than two hours to obtain a warrant).[6] Thus, it was objectively reasonable for Fombellida and his team to return to defendant's house to wait for Solis to arrive, so as to arrest the aliens when entering the van which would surreptitiously take them to San Juan or its vicinity. The fact that Solis never arrived at the defendant's house does not change the reasonable objectiveness of Fombellida's decision at the time.

Subsequently, at 9:00 p.m. when Solis failed to show-up, it was again objectively reasonable for Fombellida's team to perform a "knock and talk". This was clearly the officer's intent. However, when the officers were spotted by the aliens and pandemonium erupted inside the house, the whole scenario changed. At this time it was thus objectively reasonable for the officers to believe that:

    (i)    the aliens would try to flee rather than allow apprehension, as they had seemingly done so a few days earlier with the Border Patrol and Coast Guard;

    (ii)    persons inside the house could be armed and/or dangerous, in light of defendant's prior criminal record, plus the fact that an individual was spotted hiding next to the door of the house;

    (iii)    if the aliens fled into the mountainous area, they would not be later found; and,

---

[6] In the undersigned's own experience, it normally takes several hours to prepare and take a warrant application to a Magistrate-Judge, even when the most seasoned and responsible AUSAs and agents are involved.

**CRIMINAL NO. 06-116 (CCC)**                   8

    (iv)    there were two children inside the house who could be injured.

The totality of the above circumstances constitutionally support without a doubt the agents' warrantless entry into the defendant's house. The fact that there was a 4 ½ foot fence surrounding the house, and a 2-8 foot drop behind the house, are again irrelevant to this conclusion. At the time the agents went to perform the "knock and talk", they had not been around or behind the house. Even had they been aware of the fence and drop, however, they were unaware at the time of the identity of the aliens. It is not unreasonable for a person of average physical conditions who is fleeing authorities to jump or climb over such a fence and make the drop to continue his/her escape.

Finally, the cardboard with Dominican telephone numbers and Dominican currency found were in plain view at the time of the lawful warrantless entry. As such, they could be seized.

## CONCLUSION

In light of the above, the Court concludes that Agent Fombellida and his team acted well within reasonable and objective constitutional parameters when conducting the warrantless entry into defendant's house. The defendant's motion to suppress (Docket No. 46) must thus be DENIED.

Under the provisions of 28 U.S.C. § 636 and Local Rule 72(d), District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of the Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985), reh'g denied, 474 U.S. 1111(1986); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 7th day of July, 2006.

*S/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States Magistrate Judge